DIXON

FILED IN DISTRICT COURT
OKLAHOMA COUNTY

NOV 2 5 2015

TIM RHODES
COURT CLERK
34



*103159980 7*

## DISTRICT COURT OF OKLAHOMA COUNTY
## STATE OF OKLAHOMA

KAREN S. DAVIS,        )
                       )
    Plaintiff,         )
                       )
v.                     )        Case No. _____
                       )        CJ-2015-6472
PHYSICIANS MUTUAL INSURANCE    )
COMPANY,               )
                       )
    Defendant.         )
                       )        JURY TRIAL DEMANDED

### PETITION

Plaintiff, Karen S. Davis ("Mrs. Davis" or "Plaintiff"), for her causes of action against the

Defendant, Physicians Mutual Insurance Company ("PMIC"), alleges and states as follows:

### THE PARTIES, JURISDICTION, AND VENUE

1.    Mrs. Davis is an individual residing in Oklahoma County, Oklahoma.

2.    PMIC is a mutual insurance company with its headquarters in Omaha, Nebraska.

PMIC does business in Oklahoma County at 3121 Quail Springs Parkway.

3.    This Court has venue over this action pursuant to 12 Okla. Stat. § 187.

### FACTUAL ALLEGATIONS

4.    Between October 7, 1997, and January 9, 2003, PMIC issued and sold a Long

Term Care Policy, identified as Form P130, to residents of the State of Oklahoma. Long term

care policies are designed to provide chronically ill individuals with coverage for assistance with

activities of daily living ("ADLs"), such as bathing, dressing, and transferring; personal care

services; homemaker services, such as laundry, food shopping and errands, meal preparation, and

cleaning services; and/or adult day care services. Coverage for these services may be provided in

a setting such as a nursing home or assisted living facility, in the community, or in the home, but not in an acute care unit of a hospital

5.      Guy Decker was an insurance agent in Oklahoma, and was authorized to do business and licensed as an insurance agent in Oklahoma in 2001. Mr. Decker was an agent for PMIC.

6.      Mrs. Davis specified to Mr. Decker that she wanted a long term care policy that would pay benefits as a fixed amount per day, rather than providing reimbursement for specific expenditures. Mrs. Davis preferred a policy providing for a fixed payment over a policy providing for reimbursement because she felt it would allow her to pay for the services that were most important to her and would minimize the paperwork burden if she should find herself ill or disabled. Mr. Decker represented to Mrs. Davis that the PMIC Form P130 Long Term Care Policy was such a "per diem" policy, also known as an "indemnity" policy.

7.      Based on Mr. Decker's representations, on June 7, 2001, Mrs. Davis submitted an application to purchase a long term care policy from PMIC.

8.      Following her approval, Mrs. Davis purchased a Form P130 Long Term Care Policy from PMIC effective June 12, 2001. Mrs. Davis's policy number is #000-958-353 ("the Policy").

9.      The Policy provides a daily benefit for policy-holders receiving care in a nursing home or assisted living facility, subject to an elimination period of ninety (90) days. At the time Mrs. Davis purchased the Policy, the daily nursing home benefit reflected in her schedule of benefits was $100.00.

10.    The Policy also provides a daily benefit for policy-holders receiving home care services. The base Policy provides that the daily home care services benefit will not exceed 50% of the amount of the daily nursing home benefit.

11.    The Policy does not cap the lifetime benefit amount available to Mrs. Davis.

12.    Mrs. Davis also purchased from PMIC certain riders to the Policy.

13.    Mrs. Davis purchased the PMIC Form R485 Inflation Protection Benefit Rider ("Form R485"), which provided a compound annual 5% benefit increase. Under Form R485, the daily nursing home benefit available to Mrs. Davis increased by five percent (5%) on every anniversary date of the Policy (*i.e.* on June 12th of each year). As of the most recent anniversary date -- June 12, 2015 -- the daily nursing home benefit available to Mrs. Davis was $206.00.

14.    Mrs. Davis also purchased the PMIC Form R951 Home Care Benefit Amendment Rider ("Form R951"). Form R951 provided that, if Mrs. Davis were to receive Home Care Services covered by the Policy, the daily home care services benefit would be 100% of the daily nursing home benefit. Because Mrs. Davis purchased this rider, she was eligible to receive a daily home care services benefit that was equal to the daily nursing home benefit, rather than only 50% of the daily nursing home benefit as provided in the base Policy.

15.    The Policy states that the entire contract between Mrs. Davis and PMIC is made up of the Policy, the schedule of benefits, the application for the Policy, and any riders attached to the Policy and shown in the schedule of benefits. A copy of these documents is attached hereto as Exhibit 1.

16.    In 2004, Mrs. Davis was in an automobile accident from which she has never fully recovered. As a result of the accident, Mrs. Davis suffered a concussion and ruptured three

3

discs in her neck, requiring a neck fusion surgery. She also sustained a shoulder injury, requiring shoulder surgery.

17.    Mrs. Davis also suffers from vasodepressive syncope, which manifests in blood pressure problems and sudden fainting spells. Sudden fainting is dangerous because it can lead to falls and serious injury. Mrs. Davis has also been afflicted with dysautonomia, which manifests as chronic nausea and vomiting. Mrs. Davis also suffers from Sjogrens Syndrome and rheumatoid arthritis.

18.    By 2007, as a result of these conditions, Mrs. Davis was unable to perform several Activities of Daily Living ("ADLs"), as defined by the Policy. In order to live at home, Mrs. Davis engaged home healthcare aides to provide Home Care Services, as defined by the Policy.

19.    In February of 2007, Mrs. Davis submitted a claim to PMIC under the Policy.

20.    The Policy provides that, to be eligible for benefits, the policy-holder must meet two criteria:

- The policy-holder must be a "Chronically Ill Individual," defined as "any individual who has been certified within the preceding twelve (12) month period by a licensed health care practitioner as: being unable to perform (without substantial assistance from another individual) at least two (2) Activities of Daily Living for a period of at least ninety (90) days due to a loss of functional capacity; having a similar level of disability; or requiring substantial supervision to protect such individual from threats to health and safety due to severe Cognitive Impairment."

- The policy-holder must receive services "pursuant to a plan of care prescribed by a licensed health care practitioner."

21.    Mrs. Davis submitted a Physician's statement from Dr. Ellen Hope in support of her claim on March 6, 2007. This physician statement indicated that Mrs. Davis required assistance with numerous ADLs, including eating, bathing, dressing and undressing, ambulating, transferring, toileting, and getting in and out of bed.

4

22.    PMIC contacted Mrs. Davis on March 14, 2007, to verify her care needs. PMIC sent Heather Holm, RN, with Nation's CareLink, to evaluate Mrs. Davis. The evaluation submitted by Ms. Holm indicated that Mrs. Davis needed supervision to hands-on assistance with most ADLs. The provider agreed that Mrs. Davis was unable to perform without substantial assistance at least two ADLs for a period of at least 90 days due to a loss of functional capacity. As a Plan of Care, Ms. Holm recommended 4-6 hours per day of home health care to assist with ADLs, and 4 hours of homemaker services twice per week.

23.    Mrs. Davis retained home health care aides to perform services consistent with the recommendation of the health care practitioners.

24.    Because Mrs. Davis (1) was certified to be a Chronically Ill Individual, and (2) was receiving services pursuant to a plan of care prescribed by a licensed health care practitioner, Mrs. Davis was eligible for benefits under the Policy and, following the expiration of the elimination period on June 3, 2007, was entitled to receive the full daily home care services benefit provided by the Policy and Form R951.

25.    Although Mrs. Davis had requested, and had been told that she had purchased, a "per diem" or "indemnity" long term care policy, PMIC refused to pay Mrs. Davis the full daily home care services benefit. Rather, PMIC informed Mrs. Davis that her policy was actually a "reimbursement" policy, and that she would have to provide substantial documentation for each claim for benefits.

26.    In particular, PMIC required Mrs. Davis to submit a Plan of Treatment/Care Form from a licensed health care practitioner every two months. This Form described the precise number of hours of services needed by Mrs. Davis. PMIC initially required Mrs. Davis to submit

5

a new Plan of Treatment/Care Form every two months. Since that time, PMIC has indicated that Mrs. Davis must submit a new Form only every four months.

27.     Additionally, PMIC required Mrs. Davis to submit Weekly Patient Care Flow Sheets for each caregiver providing services in a given week. The Patient Care Flow Sheets required Mrs. Davis to indicate the caregiver's name, tax ID or social security number, and phone number; each hour worked by the caregiver and tasks performed. The Flow Sheets were required to be signed by both the caregiver and the client, under penalty of perjury.

28.     Although both the caregiver and Mrs. Davis were required to certify the nature and quantity of services performed, as well as payments made, under penalty of perjury, PMIC also required Mrs. Davis to attach copies of the cancelled checks paid to the caregivers, showing both sides of the check.

29.     From the outset, PMIC engaged in poor claims management practices. For example, PMIC did not provide the "claim forms" required under the Policy. PMIC would telephone Mrs. Davis or her husband about purported claim deficiencies, but would provide nothing in writing that provided a comprehensive explanation of the process and purported deficiencies. PMIC indicated that entire claims sent by Mrs. Davis were "lost in the mail" or never received. PMIC refused to provide Mrs. Davis with her claims history, or updated or amended Explanation of Benefits ("EOBs"), which would have shown which claims were delayed by PMIC pending further documentation. Thus, Mrs. Davis was left to attempt to determine which claims had been paid, and which had been denied. Mrs. Davis was also left to attempt to determine the basis for PMIC's failure to pay.

30.     Further, PMIC frequently lost correspondence sent by Mrs. Davis. PMIC requires Mrs. Davis to submit all correspondence by mail or by fax; they will not accept email. After

PMIC claimed not to have received several letters mailed by Mrs. Davis, Mrs. Davis began to fax all correspondence to PMIC. Her fax cover sheets would indicate the number of pages in her submission, to enable PMIC to notify her immediately of any transmission errors. Although PMIC never did so, PMIC has nevertheless delayed or denied several claims, indicating that there were pages missing from the submissions.

31.     On July 2, 2007, Mrs. Davis's new treating physician, Dr. Duc M. Tu, submitted a new Plan of Treatment/Care Form for Mrs. Davis. Dr. Tu recommended that Mrs. Davis receive a total of 7 hours per day of caregiver services, which would include 3 hours of assistance each day with ADLs, and 4 hours of assistance each day for homemaker services.

32.     As Mrs. Davis's condition deteriorated, she required additional assistance to remain in her home. As of November 19, 2007, Deborah Baysinger, a Licensed Practical Nurse ("LPN"), certified on the Plan of Treatment/Care Form that Mrs. Davis required 12 hours a day of home care services, including 8 hours of assistance per day with ADLs, and 4 hours per day of homemaker services.

33.     In 2009, to assess Mrs. Davis's continuing eligibility for benefits under the Policy, PMIC demanded an Independent Medical Examination ("IME"). PMIC engaged S.A. Chaudry, M.D., to perform the Independent Medical Examination. PMIC failed to provide any reimbursements to Mrs. Davis while the report was pending.

34.     In a May 11, 2009, report, Dr. Chaudry issued a report in which he declared Mrs. Davis to be a Chronically Ill Individual as defined by the Policy. PMIC did not notify Mrs. Davis of the results of the IME until September 9, 2009, at the request of counsel for Mrs. Davis. Other than a single payment in May of 2009, PMIC did not resume reimbursements under the Policy until April 2010.

7

35.     Mrs. Davis has submitted the PMIC "Health Care Practitioner Plan of Treatment/Care Form," completed by a licensed health care practitioner, on a periodic basis. The recommendation that Mrs. Davis 12 hours of home health care assistance per day, consisting of 8 hours/day of assistance with "activities of daily living," and 4 hours/day of "homemaker services," has not changed since November 19, 2007.

36.     Although Dr. Chaudry indicated in his 2009 IME that Mrs. Davis was chronically ill due to "irreversible disc disease," PMIC demanded a subsequent IME in 2014. The IME verified that Mrs. Davis remained a Chronically Ill Individual.

### COUNT I
### (BREACH OF CONTRACT)

37.     Mrs. Davis incorporates by reference the allegations set forth in paragraphs 1-36.

38.     Mrs. Davis has submitted claim forms to PMIC under the Policy every 4-6 weeks.

39.     For each claim submitted, PMIC was required by the Policy and Form R951 to pay Mrs. Davis the full daily home care services benefit for each day on which she received services.

40.     PMIC has not done so. Instead, PMIC has (a) told Mrs. Davis that the Policy only provides for reimbursement of her actual expenditures, and (b) required Mrs. Davis to submit detailed and burdensome claim forms and supporting documentation in order to obtain reimbursement under the Policy. For example, rather than paying the daily home health care benefit without further documentation until such time as eligibility ended or Mrs. Davis died, PMIC required that Mrs. Davis submit, among other things:

- Weekly Patient Care Flow Sheets for each caregiver, indicating: the caregiver's name, tax ID or social security number, and phone number; each hour worked by the home healthcare aide; and tasks performed. The Flow Sheets were required to be signed by both the caregiver and the client under penalty of perjury.

- Copies of the front and back of cancelled checks issued to the caregiver.

8

- Fully completed I-9 Employment Eligibility Verification forms for each caregiver.

PMIC has also required that Mrs. Davis's caregivers submit to in-person or telephonic questioning by PMIC regarding their services to Mrs. Davis. Even though HIPAA clearly does not apply to non-medical personnel, such as Mrs. Davis's caregivers, PMIC requires Mrs. Davis to submit HIPAA authorization forms for the caregivers, and uses these authorizations to justify the interviews.

41.     Mrs. Davis has tried to comply with these rules, submitting and re-submitting flow charts and supporting documentation. However, Mrs. Davis is elderly and in poor health, and such submissions are difficult, even with the assistance of her husband. Therefore, PMIC has frequently rejected her claims and Mrs. Davis has not received the full maximum daily benefit to which she is entitled under the Policy and Riders.

42.     Further, Mrs. Davis has informed PMIC that it is a violation of federal law for PMIC to require her to provide copies of the I-9 Forms that she, as the employer, retains for each of her employees. Nevertheless, PMIC continues to insist that Mrs. Davis must send the company either completed I-9 Forms for each of her employees, or must send the Social Security Number of each of her employees, so PMIC can "verify they are a legal U.S. citizen." PMIC has failed to make any payments to Mrs. Davis since July 2015 because she has not provided this unlawful documentation.

43.     The Policy does not require Mrs. Davis to submit any documentation other than that necessary to determine that she actually received home care services on each day for which she is claiming benefits. Further, the Policy does not permit PMIC to violate federal law by demanding that Mrs. Davis prove the citizenship of her employees.

9

44.     For each periodic submission by Mrs. Davis, PMIC has breached the terms of its contract by (a) requiring Mrs. Davis to submit documentation beyond that necessary to determine that Mrs. Davis actually received home care services each day, and (b) failing to pay the full daily home care services benefit for each day on which Mrs. Davis received services.

45.     Additionally, PMIC has breached its contract with Mrs. Davis by imposing limitations on its coverage not found in the Policy or the Riders. For example,

- On October 21, 2014, PMIC informed Mrs. Davis that as of that date and going forward, PMIC would not reimburse caregiver charges that reflected a daily rate of pay, but would only reimburse hourly charges.

- On October 21, 2014, PMIC informed Mrs. Davis that as of that date and going forward, PMIC would not pay benefits for any caregiver charging an hourly rate over $23.00.

- On September 22, 2014, PMIC informed Mrs. Davis that it will not provide reimbursement where two caregivers are present at the same time, despite the fact that the Plan of Treatment/Care Form calls for Mrs. Davis to receive both homemaker services (which includes cleaning, laundry, errands, and meal preparation) and assistance with activities of daily living (which include bathing, dressing, toileting, and others).

46.     None of these limitations on coverage are found in the Policy, the schedule of benefits, the application for the Policy, or any riders attached to the Policy and shown in the schedule of benefits. These documents comprise the entire contract between PMIC and Mrs. Davis.

47.     Mrs. Davis has incurred financial damages as a proximate result of PMIC's breach of contract.

## COUNT II
## (BAD FAITH MISREPRESENTATION OF POLICY)

48.     Mrs. Davis incorporates by reference the allegations set forth in paragraphs 1-47.

49.    When Mrs. Davis purchased the Policy, including the attached Riders, she was told by her agent and understood that the Policy was a "per diem" or "indemnity" policy, which would pay her the maximum benefit the policy allows for each day she was eligible for benefits.

50.    When Mrs. Davis filed her claim for benefits, however, PMIC informed Mrs. Davis that the Policy was in fact a "reimbursement" policy, which required her to account to PMIC for each expense she incurred under the Plan of Care provided by her treating physician.

51.    Mrs. Davis accepted PMIC's description of the Policy as a reimbursement policy. Although Mrs. Davis believed that her insurance agent had used intentional or unintentional misrepresentations to induce her to purchase a policy that did not provide for the coverage she was seeking, she assumed that PMIC was telling her the truth about her Policy. The agent who sold Mrs. Davis the Policy was no longer alive at this point, so he could not inform PMIC that he had told Mrs. Davis that Form P130 was a "per diem" or "indemnity" policy.

52.    PMIC then began to impose upon Mrs. Davis arbitrary and burdensome rules for the collection of benefits under the Policy.

53.    For example, rather than paying the daily home health care benefit without further documentation until such time as eligibility ended or Mrs. Davis died, PMIC required that Mrs. Davis submit, among other things:

- Weekly Patient Care Flow Sheets for each caregiver, indicating: the caregiver's name, tax ID or social security number, and phone number; each hour worked by the home healthcare aide; and tasks performed. The Flow Sheets were required to be signed by both the caregiver and the client, under penalty of perjury.

- Copies of the front and back of cancelled checks issued to the caregiver.

- Fully completed I-9 Employment Eligibility Verification forms for each caregiver.

PMIC has also required that Mrs. Davis's caregivers submit to in-person or telephonic questioning by PMIC regarding their services to Mrs. Davis.

11

54.     Mrs. Davis has tried to comply with these rules, submitting and re-submitting flow charts and supporting documentation. However, Mrs. Davis is elderly and in poor health, and such submissions are difficult, even with the assistance of her husband. Therefore, PMIC has frequently rejected her claims and Mrs. Davis has not received the full maximum daily benefit to which she is entitled under the Policy and Riders.

55.     After attempting for several years to comply with PMIC's claims submission rules, but feeling that PMIC was simply looking for excuses to deny coverage, Mrs. Davis consulted counsel in 2014, who informed her that the language of the Policy indicated that it was not a "reimbursement" policy but was, in fact, a "per diem" or "indemnity" policy. Accordingly, PMIC was required by the language of the Policy and Riders to pay Mrs. Davis the full daily home care services benefit for every day she received home care services.

56.     Mrs. Davis thus learned that her agent had been correct when he told her that the Policy she purchased from PMIC was a "per diem" or "indemnity" policy. Rather than dealing with her in good faith, PMIC had engaged in a deliberate bait-and switch scheme by selling Mrs. Davis a "per diem" or "indemnity" policy, and then telling her that it was a "reimbursement" policy.

57.     PMIC depended upon Form P130 policy-holders, such as Mrs. Davis, being elderly and ill when they submitted their claims, and therefore being more likely to accept PMIC's misrepresentation about the nature of the policy purchased.

58.     Because Form P130 is a "per diem" or "indemnity" policy, Mrs. Davis was entitled under the Policy and Riders to receive the full daily home care services benefit for every day on which she received services.

59.     PMIC had no reasonable basis for denying Mrs. Davis payment of the full daily home care services benefit. PMIC did not deal fairly and in good faith with Mrs. Davis, but rather misled her about the nature of the Policy she had purchased, and imposed burdensome claims processing procedures upon her in the hope that she would abandon her claims, or accept less than the full benefits to which she was entitled.

60.     PMIC's violation of its duty of good faith has directly caused significant injury to Mrs. Davis. Mrs. Davis has not received the full financial benefits to which she is entitled under the Policy.

61.     Further, Mrs. Davis has spent countless hours preparing correspondence submitting and re-submitting documentation to PMIC. The uncertainty about receiving reimbursement has caused Mrs. Davis enormous stress, embarrassment, and mental pain and suffering. This has had an adverse effect on Mrs. Davis's health. Additionally, because Mrs. Davis must first pay her caregivers, and then seek reimbursement from PMIC at the end of the month, Mrs. Davis has had to endure substantial financial outlays while PMIC demands further documentation.

62.     PMIC's demand that Mrs. Davis provide personal information regarding her caregivers, including I-9 forms, social security numbers, and home telephone numbers to enable PMIC to conduct employee interviews, has made it difficult for Mrs. Davis to retain caregivers.

63.     In denying Mrs. Davis the benefits to which she was entitled under the Policy and Riders, and in affirmatively misrepresenting to Mrs. Davis the nature of the Policy and her obligations with regard to claims processing, PMIC has acted with malice, entitling Mrs. Davis to punitive damages under 23 Okla. Stat. § 9.1 and all applicable laws.

13

## COUNT III
## (INSURANCE BAD FAITH -- SPECIFIC PRACTICES)

64.     Mrs. Davis incorporates by reference the allegations set forth in paragraphs 1-63.

65.     In addition to its malicious misrepresentation of the nature of the Policy to Mrs.

Davis, PMIC has breached its duty of good faith and fair dealing to Mrs. Davis through certain

specific practices. In particular:

A.     PMIC has refused to provide reimbursement for payments to caregivers where
Mrs. Davis has not provided I-9 immigration documentation to PMIC for the
caregiver. When Mrs. Davis informed PMIC that her research indicated that it
was unlawful for her to provide her employees' I-9 forms to PMIC, PMIC
demanded that she provide the social security numbers of her employees, so
PMIC could verify their citizenship. Such a demand violates federal law, and
PMIC cannot reasonably deny payment on this basis.

B.     PMIC has refused to provide reimbursement for payments to caregivers where the
hourly rate charged by the caregiver exceeds $23.00. This limitation on coverage
has no basis in the contract between PMIC and Mrs. Davis, and PMIC has no
reasonable basis to deny reimbursement on this basis.

C.     PMIC has refused to provide reimbursement for payments to caregivers unless
they are permitted to interview the caregivers by telephone or in person regarding
the services they perform for Mrs. Davis and about how sick Mrs. Davis seems to
them. The caregivers are not medical personnel, but PMIC has indicated after
certain interviews that services to Mrs. Davis should be curtailed. Moreover, the
telephone interviews appear threatening and challenging to them. PMIC's
insistence on conducting telephone interviews has made it difficult for Mrs. Davis
to retain caregivers. PMIC has no reasonable basis for delaying or denying
payments to Mrs. Davis based upon employee interviews. Further, PMIC's
conduct has had the effect of depriving Mrs. Davis of the caregivers of her choice.

D.     PMIC has demanded that Mrs. Davis provide signed HIPAA authorization forms
to permit them to contact these caregivers, despite the fact that the caregivers are
not medical personnel and not subject to HIPAA.

E.     PMIC has refused to provide reimbursement for more than one caregiver in the
home at any one time. The Plan of Treatment/Care Form indicates that Mrs. Davis
requires 8 hours per day of assistance with "activities of daily living," and 4 hours
per day of "homemaker services." It is consistent with this Plan of Treatment for
one caregiver to be folding laundry and preparing meals, while another caregiver
assists Mrs. Davis with bathing, toileting, or dressing. PMIC claims, however,
that there cannot be two caregivers in the home at one time unless the Plan of

Treatment/Care Form specifically states that there must be two caregivers in the home. There is no reasonable basis for PMIC to deny payment on this basis.

F.   PMIC has refused to provide reimbursement for claims where Mrs. Davis does not provide a photocopy of both the front and the back of the cancelled checks she gives to her caregivers. There is nothing in the Policy that requires Mrs. Davis to pre-pay her caregivers prior to receiving reimbursement from PMIC. Neither is there any provision in the Policy that prevents Mrs. Davis from paying her caregivers by whatever lawful tender she desires. There is no reasonable basis for PMIC to deny or delay payment to Mrs. Davis based on the alleged failure to produce a copy of the front and the back of every cancelled check given to a caregiver.

G.   PMIC fails to provide a reasonable method for appeal of its decisions to deny reimbursement to Mrs. Davis. The Policy states that there is an "appeal process" if the policy holder believes that a claim decision has been made in error. Mrs. Davis invoked this appeal process on October 14, 2014. Mrs. Davis was surprised to receive a response to her "appeal" from the same "Resource Advisor" who made the initial decision to deny the claim. Where the Policy promises the policy-holder an "appeal process," the policy-holder may reasonably expect that this will entail review of the decision by a supervisor or, at a minimum, another claims agent. By failing to provide such review of the decisions of the "Resource Advisor" assigned to Mrs. Davis, PMIC has not dealt fairly and in good faith with Mrs. Davis.

66.   Mrs. Davis has spent countless hours preparing correspondence submitting and re-submitting documentation to PMIC. The uncertainty about receiving reimbursement, and the harassment of her care givers, has caused Mrs. Davis enormous stress, embarrassment, and mental pain and suffering. This has had an adverse effect on Mrs. Davis's health.

67.   PMIC's demand that Mrs. Davis provide personal information regarding her caregivers, including I-9 forms, social security numbers, and home telephone numbers to enable PMIC to conduct employee interviews, has made it difficult for Mrs. Davis to retain caregivers.

68.   In denying Mrs. Davis the benefits to which she was entitled under the Policy and Riders, and in engaging in the practices described above, PMIC has acted with malice, entitling Mrs. Davis to punitive damages under 23 Okla. Stat. § 9.1 and all applicable laws.

15

## COUNT IV
## (DECLARATORY JUDGMENT)

69.     Mrs. Davis incorporates by reference the allegations set forth in paragraphs 1-68.

70.     The Policy provides that, when the policyholder is eligible for and receives home care services covered by the Policy, PMIC will pay a daily benefit to the policyholder.

71.     The Policy provides that, to be eligible for benefits, the policy-holder must meet two criteria:

- The policy-holder must be a "Chronically Ill Individual," defined as "any individual who has been certified within the preceding twelve (12) month period by a licensed health care practitioner as: being unable to perform (without substantial assistance from another individual) at least two (2) Activities of Daily Living for a period of at least ninety (90) days due to a loss of functional capacity; having a similar level of disability; or requiring substantial supervision to protect such individual from threats to health and safety due to severe Cognitive Impairment."

- The policy-holder must receive services "pursuant to a plan of care prescribed by a licensed health care practitioner."

72.     Form P130 is a "per diem" or "indemnity" policy. This type of policy pays the maximum benefit the policy allows, regardless of what the policyholder's long term care expenses are.

73.     Form P130 is not a "reimbursement" policy. This type of policy does not pay more than the qualifying long term care expenses incurred.

WHEREFORE, Plaintiff Karen Davis prays for judgment against PMIC as follows:

1.     Damages for breach of contract in an amount to be determined at trial.

2.     Damages for breach of the duty of good faith and fair dealing in an amount to be determined at trial;

3.     Punitive damages for Defendant's tortious and malicious conduct;

4.     Attorney fees and costs in being forced to seek this relief; and

5.     Such other and further relief to which Plaintiff might be entitled and which may be just and equitable under the facts and circumstances.

Plaintiff Karen Davis further request that this Court enter an order declaring, as a matter of law, that PMIC Form P130 is a "per diem" or "indemnity" policy, and not a "reimbursement" policy. Accordingly, PMIC must pay Mrs. Davis the full daily benefit under the Policy (currently $206.00) for each day on which she receives services until such time as she dies or is no longer certified as a Chronically Ill Individual.

Respectfully submitted,

Yara A. LaClair, OBA # 21903
Mary H. Tolbert, OBA #17353

- Of the Firm -

CROWE & DUNLEVY, P.C.
Braniff Building
324 N. Robinson Ave., Suite 100
Oklahoma City, OK 73102
Telephone: (405) 239-6672
Facsimile: (405) 272-5914
molly.tolbert@crowedunlevy.com

ATTORNEYS FOR PLAINTIFF
KAREN S. DAVIS

JURY TRIAL DEMANDED



# PHYSICIANS MUTUAL INSURANCE COMPANY®

### 2600 DODGE ST. • OMAHA, NE 68131-2671

*This Policy Prepared Especially For:*



Karen S Davis
3400 Twelve Oaks Rd
Oklahoma City, OK 73120-5511

---

## LONG-TERM CARE POLICY

**TABLE OF CONTENTS:**

| | |
|---|---|
| Important Notices | Page 1 |
| Renewal Agreement | Page 1 |
| Benefits | Page 2 |
| Eligibility for the Payment of Benefits | Page 3 |
| Definitions | Page 3 |
| Payment of Claims | Page 5 |
| Policy Limitations | Page 5 |
| Misstatements in an Application | Page 6 |
| Payment of Premium | Page 6 |
| General Provisions | Page 7 |

**Notice to Buyer:** This long-term care insurance Policy ("Policy") may not cover all of the costs associated with long-term care incurred by the buyer during the period of coverage. The buyer is advised to review carefully all Policy Limitations.

**Caution:** The issuance of this Policy is based upon Your responses to the questions on Your application. A copy of Your application is attached. If Your answers are incorrect or untrue, We have the right to deny benefits or rescind Your Policy. The best time to clear up any questions is now, before a claim arises! If, for any reason, any of Your answers are incorrect contact the company at this address: 2600 Dodge, Omaha, NE 68131.

**IMPORTANT NOTICES:**

**Fraud Warning:** Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**This Contract** is between Physicians Mutual Insurance Company ("We", "Us" or "Our") and the Insured shown on the Schedule of benefits ("You", "Your" or "Insured"). The entire contract is made up of this Policy, the Schedule of benefits, Your application for this Policy and any riders attached to this Policy signed by an Officer of Our company and shown on the Schedule of benefits.

**30 Day Right To Examine The Policy:** If You return the Policy within 30 days after You get it, We will return Your money. Then the Policy is void as if no Policy had been issued. If We do not return Your money within 30 days after You return the policy, We will add interest to the refund. The interest payable is equal to the average U. S. Treasury Bill rate for the calendar year preceding the refund, plus two (2) percent.

**Read Your Application:** Be sure the application is correct and complete. Notify Us immediately if it is not. We rely on all statements made by You or for You on the application You signed. If any statement is incorrect or incomplete, Your Policy may be void.

**RENEWAL AGREEMENT:**

**Guaranteed Renewable With Timely Payment:** When We receive Your Renewal Premium before the Grace Period ends and before the Lifetime Maximum Benefit Amount has been paid, We must accept it.

---

Form P130OK

**EXHIBIT**

**1**

**Premium Changes:** We may change Your Renewal Premium only if We make the same change for all Policies of this form and class in the state where You live.

**BENEFITS:**

**Nursing Home and Assisted Living Facility Benefit:** When You are eligible for and receive care covered by this Policy in a Nursing Home or Assisted Living Facility, We will pay a benefit, subject to any Elimination Period shown in the Schedule of Benefits. That benefit will be for the charges made by the Nursing Home or Assisted Living Facility, not to exceed the amount of the Daily Nursing Home Benefit shown in the Schedule of benefits or in effect at the time You receive care. It will be paid for each day You receive care in a Nursing Home or Assisted Living Facility. This benefit is subject to Your Lifetime Maximum Benefit Amount.

**Home Care Benefit:** When You are eligible for and receive Home Care services covered by this Policy, We will pay a benefit, subject to any Elimination Period shown in the Schedule of Benefits. That benefit will be for the charges for each day of Home Care Services, not to exceed 50% of the amount of the Daily Nursing Home Maximum Benefit shown in the Schedule of benefits or in effect at the time You receive care. It will be paid for each day You receive Home Care service. This benefit is subject to Your Lifetime Maximum Benefit Amount.

**Respite Care and Hospice Care Benefit:** When You are eligible for and receive Respite Care or Hospice Care covered by this Policy, We will pay a benefit, subject to any Elimination Period shown in the Schedule of Benefits. That benefit will be for the charges made for such services, not to exceed the amount of the Daily Nursing Home Benefit shown in the Schedule of benefits or in effect at the time You receive care. This benefit is subject to Your Lifetime Maximum Benefit Amount.

**Waiver of Premium:** Premium payments shall be waived during Nursing Home or Assisted Living Facility stays once the Insured has received Nursing Home or Assisted Living Facility benefits, including the elimination period, for ninety (90) consecutive days. We will waive the payment of premiums that come due thereafter during the continuance of consecutive days for which such benefits are paid. This waiver, which includes premiums for any attached rider, will continue until the premium due date that follows the date We stop paying benefits for Nursing Home or Assisted Living Facility care.

**Bed Reservation Benefit:** If a temporary hospitalization is required during a period of confinement in a Nursing Home or Assisted Living Facility and the Elimination Period has been met, We will consider the reservation charges to be room and board charges and We will pay the benefits that You would have received under the Nursing Home Benefit. The Policy shall pay Bed Reservation Benefits for up to twenty-one (21) days of hospitalization during a calendar year. If a temporary hospitalization is required during a period of confinement in a Nursing Home or Assisted Living Facility and the Elimination Period has not been met, then each day the Insured is hospitalized will count toward the Elimination Period.

**Alternate Plan of Care Benefit:** If You would otherwise be eligible to receive benefits for confinement in a Nursing Home or an Assisted Living Facility, We may pay for services provided under a written Alternate Plan of Care. This Alternate Plan of Care must be agreed on in advance by You, Your licensed health care practitioner and Us. This benefit is subject to Your Lifetime Maximum Benefit Amount.

**Home Modification Benefit:** We will pay a one-time benefit of $1,000 toward modification of Your existing residence to improve access to facilities used in providing benefits for Home Health Care.

**Restoration of Benefits:** We will restore the Lifetime Maximum Benefit Amount of this Policy listed in the Schedule of benefits

N-155-1094

when you have not received care or services covered by this Policy for a period of twelve (12) months and Your licensed health care practitioner has not certified You as a Chronically Ill Individual within the preceding twelve (12) months. There is no limit to the number of times the Lifetime Maximum Benefit Amount will restore as long as You meet the above requirements.

**Lifetime Maximum Benefit Amount** is set forth in the Schedule of benefits. The Lifetime Maximum Benefit Amount is the combined total dollar amount We will pay for all Nursing Home and Assisted Living Facility Benefits, Home Care Benefits, Respite Care and Hospice Care Benefits, Alternate Level of Care Benefits, and the Bed Reservation Benefits as shown in the Schedule of benefits during Your lifetime, except as stated in the Restoration of Benefits Provision. The lifetime dollar maximum may be greater than the amount shown in the Schedule of benefits if the optional Inflation Protection Rider is in force. Coverage under this Policy automatically ends after we have paid out the Lifetime Maximum Benefit Amount.

**ELIGIBILITY FOR THE PAYMENT OF BENEFITS:**

To be eligible for any type of benefit under this Policy, You must be a Chronically Ill Individual and services must be provided pursuant to a plan of care prescribed by a licensed health care practitioner.

**Chronically Ill Individual** means any individual who has been certified within the preceding twelve (12) month period by a licensed health care practitioner as: being unable to perform (without substantial assistance from another individual) at least two (2) Activities of Daily Living for a period of at least ninety (90) days due to a loss of functional capacity; having a similar level of disability; or requiring substantial supervision to protect such individual from threats to health and safety due to severe Cognitive Impairment.

**DEFINITIONS:**

When used in this Policy:

**Activities of Daily Living (ADL's)** are bathing, continence, dressing, eating, toileting and transferring.

"**Bathing**" means washing oneself by sponge bath; or in either a tub or shower, including the task of getting into or out of the tub or shower.

"**Continence**" means the ability to maintain control of bowel and bladder functions; or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene (including caring for catheter or colostomy bag).

"**Dressing**" means putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

"**Eating**" means feeding oneself by getting food into the body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously.

"**Toileting**" means getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene.

"**Transferring**" means moving into or out of a bed, chair or wheelchair.

**Adult Day Care** means a program of community based social and health-related services provided during the day in a community group setting for the purpose of supporting frail, impaired elderly or other disabled adults who can benefit from care in a group setting outside the individual's home.

**Assisted Living Facility** is a place that is licensed by the state to provide 24 hour per day care and related services to resident inpatients in support of needs resulting from Cognitive Impairment and/or the inability to perform Activities of Daily Living. The facility has a trained employee on site at all times to provide such care; provides three (3) meals a day and accommodates special dietary

N-188-0591

needs; and has appropriate methods and procedures for handling and administering prescribed medications.

An Assisted Living Facility known as a Residential Care Facility, Adult Congregate Living Facility, or any other name, will be considered eligible if it meets the terms of this definition. An Assisted Living Facility does not mean an individual residence or independent living unit or apartment. If a facility has multiple licenses and/or multiple purposes, only confinement in the section, wing, ward, or unit that specifically qualifies as an Assisted Living Facility will be eligible for benefits.

**Cognitive Impairment** means a deficiency in a person's short or long-term memory, orientation as to person, place and time, deductive or abstract reasoning, or judgment as it relates to safety awareness.

**Daily Nursing Home Maximum Benefit:** This is the greatest amount We will pay for all the expenses You incur on any one day and are covered under the Nursing Home and Assisted Living Facility Benefit, Home Care Benefit, Respite Care and Hospice Care Benefit, Alternate Level of Care Benefit, and the Bed Reservation Benefit. (That amount may be greater if the optional Inflation Protection Rider is in force.)

**Elimination Period** is a time period during which a Chronically Ill Individual does not receive benefits. It begins with the first day on which benefit eligibility is established. The Elimination Period is in effect for the number of days shown in the Schedule of benefits. A new Elimination Period applies if You are not eligible for benefits for twelve (12) months in a row.

**Homemaker Services** means domestic or cleaning services, laundry services, food shopping and errands, meal preparation and cleanup, transportation assistance to and from medical appointments, and heavy cleaning which involves thorough cleaning of the home to remove hazardous debris or dirt.

**Home Care Services** means medical and nonmedical services provided to Chronically Ill Individuals. Such services shall include Homemaker Services, Personal Care Services and Adult Day Care Services.

**Hospice Care** means services that are designed to provide palliative care, alleviate the physical, emotional, social, and spiritual discomforts of an individual who is experiencing the last phases of life due to existence of a terminal disease, and to provide supportive care to a primary care giver and the family.

**Medicare** means "The Health Insurance for the Aged Act, Title XVIII of the Social Security Amendments of 1965 as then constituted or later amended," or "Title I, Part I of Public Law 89-97, as enacted by the Eighty-Ninth Congress of the United States of America and popularly known as the Health Insurance for the Aged Act, as then constituted and any later amendments or substitutes thereof."

**Nursing Home** is a place, or that part of one, which is licensed by the State as a nursing home (skilled, intermediate or custodial), provided the nursing home:

(1) provides 24 hour room and board accommodations for not less than 10 persons, and

(2) is supervised by a Registered Nurse or Licensed Practical Nurse, and

(3) maintains daily medical records for each patient, and

(4) controls and records all medication given.

Nursing Home does not mean a place primarily used for the care and treatment of mental disease or disorders, drug addiction or alcoholism; nor an acute care hospital.

**Personal Care Services** means the provision of assisting an individual with Activities of Daily Living.

**Respite Care** is short term care provided in an institution, in the home, or in a community-based program that is designed to relieve a primary care giver in the home. This benefit is limited to one month per year.

**PAYMENT OF CLAIMS:** On all claim matters, contact Physicians Mutual Insurance Company, P.O. Box 2018, Omaha, NE 68103-2018.

**Notice of Claim:** You must provide Us with written notice of claim within 20 days after You have been certified as a Chronically Ill Individual or as soon as reasonably possible. The notice can be given to Us at the address above, or to any of Our authorized agents. Notice should include Your name and the Policy number.

**Claim Forms:** We will send You claim forms after We get notice of claim. For a continuing loss, We will furnish forms with each periodic benefit payment. If We do not furnish forms within 15 days, You can submit proof of loss (a written statement of the nature and extent of the loss) without using Our claim forms.

**Proof of Loss:** Proof of loss means proof that You have been certified as a Chronically Ill Individual. We require that written proof of loss be given within 90 days after the start of each period being claimed. However, We will not reduce nor deny the claim if proof is given as soon as reasonably possible. In no event, except for the absence of legal capacity, can proof be given later than 15 months from the date of loss.

**Physical Examination:** We, at Our own expense, can require that You be examined by a licensed health care practitioner of Our choice as often as is reasonable.

**Time of Payment:** We will pay all claims due as soon as We have valid proof. For a continuing loss, We are not required to pay more often than monthly.

**How to Appeal a Claim Decision:** You will be informed by Us in writing if a claim, or any part of a claim, is denied.

**Appeal Process:** If you believe that Our claim decision is in error, We will reconsider Your claim. You must send Us a brief note (no special form is needed) that tells Us why You feel We should change Our decision. You may authorize someone else to act for You in this appeal process.

The note should include the names, addresses and phone numbers of any of the following providers You think We should contact to learn more about Your health and the care You received: the Doctors, Care Coordinators, health care professionals and other care providers who treated You; and the facilities from which You received care, treatment, services, equipment or other items.

Once We complete Our review of Your claim, We will immediately tell You Our decision in writing; and pay any benefits then due as a result of Our reconsideration.

**To Whom Paid:** We will pay benefits to You, unless You assign the benefits to another. If, at the time of Your death, there is an unpaid benefit, We will pay it to Your estate; however, We may pay up to $1000 of it to any relative We find entitled. Our obligation is satisfied to the extent of such payment.

**POLICY LIMITATIONS:** We will not pay for expenses incurred:

(1)   while Your Policy is not in force;

(2)   due to intentional, self-inflicted injury or attempted suicide;

(3)   due to mental or nervous disorders, unless they result from organic diseases including Alzheimer's;

N-166-0591

(4) that are payable by Medicare or any other Federal or State program, except Medicaid;

(5) outside the United States, its territories or possessions;

(6) that are payable under any worker's compensation or employer's liability laws;

(7) due to alcoholism or drug addiction;

(8) for hospital or physician services, prescription drugs, x-rays and lab work;

(9) for confinement in a facility primarily used for the care and treatment of mental disease ، disorders, drug addiction or alcoholism, nor an acute care hospital;

(10) due to injuries or sickness resulting from an act of declared or undeclared war; or

(11) for services provided by a person related by blood or marriage.

**MISSTATEMENTS IN AN APPLICATION:** If a condition is not disclosed on any application and it would have affected the terms of the coverage Our underwriting standards, then in effect, had it been disclosed, We may void the coverage. For loss that starts after two (2) years from the Policy Effective Date, only fraudulent misstatements may be used to void the Policy or to deny any claim.

No claim for loss commencing after the Effective Date of coverage shall be reduced or denied on the grounds that a disease or physical condition existed prior to the Effective Date of coverage.

**PAYMENT OF PREMIUM:** **Policy Issue— First Premium:** If the First Premium shown in the Schedule of benefits has been paid, this Policy goes into effect on the Policy Effective Date shown in the Schedule of benefits.

**Grace Period:** You have 31 days after the due date to pay each Renewal Premium. The Policy stays in effect during this Grace Period.

**Late Payment— Lapse:** If We do not receive Your Renewal Premium before the Grace Period ends, We will provide You and any designated person other than Yourself written notice of nonpayment of premium at least 30 days prior to the Effective Date of cancellation. If We do not receive Your Renewal Premium within 30 days of this notice, Your coverage stops. This is a Lapse and Your Policy is no longer in force.

**Extension of Benefits:** Termination of long-term care insurance shall be without prejudice to any benefits payable for institutionalization if such institutionalization began while the long-term care insurance was in force and continues without interruption after termination. Such extension of benefits beyond the period the long-term care insurance was in force may be limited to the duration of the benefit period, if any, or to payment of the maximum benefits and may be subject to any Policy waiting period and all other applicable provisions of the Policy.

**Reinstatement:** If Your Policy lapses, We may put it back in force (reinstate) at Our option. If We accept a late premium and do not require an application, Your Policy is reinstated. If We require an application and issue a conditional receipt for the premium tendered, Your Policy is reinstated when We approve the application, or (unless We have already disapproved it in writing) on the 45th day following the date of such conditional receipt.

However, in the event of lapse for non-payment of premium due to Cognitive Impairment, We will reinstate Your Policy as of the date of such lapse, provided:

(1) You request such reinstatement no later than five (5) months after the date Your Policy lapsed, and

(2) You submit proof that You were Cognitively Impaired at the time premium was due and unpaid and Your Policy lapsed, and

(3) You pay any premiums due from the date Your premium was due and unpaid to the date of reinstatement.

The reinstated Policy is in force to cover Nursing Home, Assisted Living Facility, Home Care, Respite Care, Hospice Care, Home Modification and Bed Reservation Charges that:

(1) start after reinstatement, and

(2) are incurred while You are a Chronically Ill Individual.

In all other respects, the Policy remains the same except for any provisions noted or attached to the Policy.

**GENERAL PROVISIONS:**

**Misstatement of Age:** If Your age was misstated and this Policy would not have been issued at Your correct age, the Policy is void. We will refund all Premiums You paid less the amount of claims paid under this Policy.

If Your age was misstated and a different premium would have been charged, the benefits will be adjusted to what the premium paid would have purchased using the correct age.

**Legal Actions:** You can't bring a legal action to recover under the Policy: (a) until 60 days after You have given written proof of loss, or (b) more than three years after the date of proof of loss is required.

**Conformity With State Statutes:** Any provision of this Policy in conflict with the laws of the state where You reside on its Effective Date is Amended to the minimum requirements of those laws.

**Periods of Insurance:** All periods of insurance begin and end at 12:01 A.M., Standard Time at Your residence.

**Annual Meetings:** The annual meeting is held at 12 o'clock, noon on the third Saturday of February at the Home Office.

Signed, for Physicians Mutual Insurance Company, 2600 Dodge Street, Omaha NE, 68131.

| W. R. Hauser, M.D. | R. A. Reed | John B Davis, M. |
|---|---|---|
| Chairman of the Board | President | Secretary |

N-166-0591

## INFLATION PROTECTION BENEFIT RIDER

**RIDER EFFECTIVE DATE:** This Rider is part of the Policy and subject to its limitations, definitions and other provisions not in conflict with this Rider. If the Rider premium has been paid, this Rider is effective the same date as the Policy. After this Rider is added, it cannot be removed.

**RIDER PREMIUMS:** Rider premiums are payable for as long as You own the Policy.

**BENEFITS:** On each annual anniversary of the Policy Effective Date, for as long as You own this Policy, We promise to increase Your Daily Nursing Home Maximum Benefit and the Lifetime Maximum Benefit Amount by five percent (rounded up to the next highest dollar of Your then current benefit amount). This option provides You with a compounded annual five percent benefit increase over Your original Daily Nursing Home Maximum Benefit and Lifetime Maximum Benefit Amount. There is no limit on the maximum size of the Daily Nursing Home Maximum Benefit or the Maximum Lifetime Benefit Amount available under the provisions of this Rider.

Each annual increase in the Daily Nursing Home Maximum Benefit will apply to each day for which benefits are payable on or after the date of the increase.

**TERMINATION:** This Rider terminates upon the earlier of:

(1) Your death; or

(2) Termination of the Policy.

PHYSICIANS MUTUAL INSURANCE COMPANY

*Jₙ B Davis M.T.*

Secretary

Form R485

# SCHEDULE

4-17-00018

```
POLICY NUMBER:                                   000-958-353
POLICY EFFECTIVE DATE:                           06-12-01
SCHEDULE EFFECTIVE DATE:                         06-12-01
MODE OF PAYMENT:                                    ANNUAL
FIRST PREMIUM:                                   $1,328.20
RENEWAL PREMIUM:                                 $1,322.20

PREMIUM MODES AVAILABLE

ANNUAL:                                          $1,322.20
SEMI-ANNUAL:                                       $673.12
QUARTERLY:                                         $348.58
MONTHLY:                                           $120.20
CHECK-O-MATIC:                                     $114.19
```

The effective date of the Schedule is the Schedule Effective Date
shown above.  This Schedule replaces all prior schedules.

ELIMINATION PERIOD:                     90   DAYS

DAILY NURSING HOME MAXIMUM BENEFIT:              $100.00

LIFETIME MAXIMUM BENEFIT AMOUNT:                 LIFETIME


NAME OF INSURED:
        Karen S Davis


ISSUE AGE:      55

RIDERS:   INFLATION PROTECTION BENEFIT RIDER            R485
          HOME CARE BENEFIT RIDER                       R951
          SURVIVING SPOUSE WAIVER OF PREMIUM RIDER      R952

EXAMINED AND COUNTERSIGNED BY:          910-0579-14557

LICENSED RESIDENT AGENT

THIS POLICY IS INTENDED TO BE A QUALIFIED LONG TERM CARE INSURANCE
CONTRACT UNDER SECTION 7702B OF THE IRS CODE.

RIDERS: AL571 P1862 AM1 R485 R951 R952 R487


FORM P130 OK

## HOME CARE BENEFIT AMENDMENT RIDER

**RIDER EFFECTIVE DATE:** This Rider is part of the Policy and subject to its limitations, definitions and other provisions not in conflict with this Rider. If the Rider premium has been paid, this Rider is effective the same date as the Policy.

**RIDER PREMIUMS:** Rider premiums are included in the premiums shown in the Schedule.

**BENEFITS:** This Rider deletes the Home Care Benefit paragraph in Your Policy and substitutes the paragraph below.

**Home Care Benefit:** When You are eligible for and receive Home Care Services covered by this Policy, We will pay a benefit, subject to any Elimination Period shown in the Schedule of Benefits. That benefit will be for the charges for each day of Home Care Services, not to exceed 100% of the amount of the Daily Nursing Home Maximum Benefit shown in the Schedule or in effect at the time You receive care. It will be paid for each day You receive Home Care Services. This benefit is subject to Your Lifetime Maximum Benefit Amount shown in the Schedule.

PHYSICIANS MUTUAL INSURANCE COMPANY

*John B Davis M.D.*

Secretary

Form R951

## SURVIVING SPOUSE WAIVER OF PREMIUM RIDER

**RIDER EFFECTIVE DATE:** This Rider is part of the Policy and subject to its limitations, definitions and other provisions not in conflict with this Rider. If the Rider premium has been paid, this Rider is effective the same date as the Policy.

**RIDER PREMIUMS:** Rider premiums are included in the premiums shown in the Schedule.

**WAIVER OF PREMIUM:** We will waive the premium that comes due for Your Policy and all Riders attached to Your Policy for the remainder of Your lifetime beginning on the latter of:

1. The date of death of Your spouse; or

2. The tenth (10th) Anniversary Date of this Rider, if the death of Your spouse occurs before the Rider's tenth (10th) anniversary. The Anniversary Date means the same month and day as the Rider Effective Date for each succeeding year the Rider remains in force.

**LIMITATIONS:** The Waiver of Premium provision provided by this Rider will only apply if:

1. Both You and Your spouse have the same Policy Effective Date and Rider Effective Date for coverage with Us under the same Policy form with this Rider form attached to both Policies; and

2. Your coverage is continuously in effect from the Rider Effective Date until the date that We begin to waive Your premiums under the Waiver of Premium provision of this Rider; and

3. Your spouse's coverage is continuously in effect from the Rider Effective Date until the earlier of;

   a) the date of death of Your spouse, or

   b) the date Your spouse's Policy terminates after We have paid out the Lifetime Maximum Benefit Amount.

PHYSICIANS MUTUAL INSURANCE COMPANY

*John B Davis M.T.*

Form R952                                   Secretary

## SPOUSE PREMIUM DISCOUNT RIDER

**RIDER
EFFECTIVE
DATE:**
_____

This Rider is part of the Policy to which it is attached, provided it is shown on the Schedule of benefits, and subject to its limitations, definitions and other provisions not in conflict with this Rider. This Rider is effective on the same date as the Policy unless some other date is shown above.

**BENEFIT:**   We will reduce Your Policy premium by an amount equal to 7.5% of such Policy premium. This discount applies only to Your Policy premium and does not apply to premiums (if any) charged to You for additional Rider coverages attached to Your Policy.

**CONDITIONS:**   In order to qualify for such premium discount:

(1)   You must be married on the first day of each premium period to which such discount is applied;

(2)   Your spouse must have a Long-Term Care Policy with Us, which is fully paid-up and in effect on the first day of each premium period to which such discount is applied; and

(3)   You and Your spouse are both living.

PHYSICIANS MUTUAL INSURANCE COMPANY

_John B Davis M.T._

Secretary

Form R487

N-166-0591

**Physicians Mutual Insurance Company**
2600 Dodge Street
Omaha, Nebraska 68131

---

### NOTICE CONCERNING COVERAGE LIMITATIONS AND EXCLUSIONS UNDER THE OKLAHOMA LIFE AND HEALTH INSURANCE GUARANTY ASSOCIATION ACT

---

Residents of Oklahoma who purchase life insurance, annuities or health insurance should know that the insurance companies licensed in this state to write these types of insurance are members of the Oklahoma Life and Health Insurance Guaranty Association. The purpose of this association is to assure that policyholders will be protected, within limits, in the unlikely event that a member insurer becomes financially unable to meet its obligations. If this should happen, the Guaranty Association will assess its other member insurance companies for the money to pay the claims of insured persons who live in this state and, in some cases, to keep coverage in force. The valuable extra protection provided by these insurers through the Guaranty Association is not unlimited, however. And, as noted in the box below, this protection is not a substitute for consumers' care in selecting companies that are well-managed and financially stable.

---

**The Oklahoma Life and Health Insurance Guaranty Association may not provide coverage for this policy. If coverage is provided, it may be subject to substantial limitations or exclusions, and require continued residency in Oklahoma. You should not rely on coverage by the Oklahoma Life and Health Insurance Guaranty Association in selecting an insurance company or in selecting an insurance policy.**

**Coverage is *NOT* provided for your policy or any portion of it that is not guaranteed by the insurer or for which you have assumed the risk, such as a variable contract sold by prospectus.**

**Insurance companies or their agents are required by law to give or send you this notice. *However, insurance companies and their agents are prohibited by law from using the existence of the guaranty association to induce you to purchase any kind of insurance policy.***

**The Oklahoma Life and Health Insurance Guaranty Association**
**600 Bank of Oklahoma Plaza**
**Oklahoma City, Oklahoma 73102**

**Oklahoma Department of Insurance**
**P.O. Box 53408, Oklahoma City, Oklahoma 73152-3408**

---

The state law that provides for this safety-net coverage is called the Oklahoma Life and Health Insurance Guaranty Association Act. Below is a brief summary of this law's coverages, exclusions and limits. This summary does not cover all provisions of the law; nor does it in any way change anyone's rights or obligations under the act or the rights or obligations of the guaranty association.

### COVERAGE

Generally, individuals will be protected by the Life and Health Insurance Guaranty Association if they live in this state and hold a life or health insurance contract, or an annuity, or if they are insured under a group insurance contract, issued by a member insurer. The beneficiaries, payees or assignees of insured persons are protected as well, even if they live in another state.

## WARNING

Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**PHYSICIANS MUTUAL INSURANCE COMPANY**
**PHYSICIANS LIFE INSURANCE COMPANY**

ALL-571

## EXCLUSIONS FROM COVERAGE

However, persons holding such policies are **not** protected by this Association if:

- they are eligible for protection under the laws of another state (this may occur when the insolvent insurer was incorporated in another state whose guaranty association protects insureds who live outside that state);
- the insurer was not authorized to do business in this state;
- their policy was issued by an HMO, a fraternal benefit society, a mandatory state pooling plan, a mutual assessment company or similar plan in which the policyholder is subject to future assessments, or by an insurance exchange.

The Association also does **not** provide coverage for:

- any policy or portion of a policy which is not guaranteed by the insurer or for which the individual has assumed the risk, such as a variable contract sold by prospectus;
- any policy of reinsurance (unless an assumption certificate was issued);
- interest rate yields that exceed an average rate;
- dividends;
- credits given in connection with the administration of a policy by a group contract holder;
- employers' plans to the extent they are self-funded (that is, not insured by an insurance company, even if an insurance company administers them);
- unallocated annuity contracts (which give rights to group contract holders, not individuals).

## LIMITS ON AMOUNT OF COVERAGE

The act also limits the amount the Association is obligated to pay out: The Association cannot pay more than what the insurance company would owe under a policy or contract. Also, for any one insured life, the Association will pay a maximum of $300,000—no matter how many policies and contracts there were with the same company, even if they provided different types of coverages. Within this overall $300,000 limit, the Association will not pay more than $100,000 in cash surrender values, $300,000 in health insurance benefits, $300,000 in present value of annuities, or $300,000 in life insurance death benefits—again, no matter how many policies and contracts there were with the same company, and no matter how many different types of coverages.

PM-1862

## AMENDMENT TO APPLICATION

I hereby amend my application for insurance in the following particulars:
MAXIMUM BENEFIT IS CHANGED FROM 5 YEARS TO LIFETIME.

It is understood and agreed that this Rider forms a part of Policy No. 000-958-353         , issued by the
Physicians Mutual Insurance Company to Karen S Davis
on the 12TH    day of JUNE         , 2001  , and is effective as of said issue date.

Signed at _____Oklahoma City_____ , this _10th_ day of ___September___ , _2001_

_Karen S Davis_
Insured

Approved as a Rider on the above numbered policy.

PHYSICIANS MUTUAL INSURANCE COMPANY

_John B Davis M.D._

Form AM-1                                         Secretary

N-166-0591